The next case is Spencer v. Capra. Good morning, Your Honors, and may it please the Court. My name is Richard Levitt, along with our associate Zach Siegel, we represent Andrew Spencer on appeal from the district court denial of his habeas corpus petition based on a claim of ineffective assistance of counsel. When we were before this court last in 2019, this court, like three courts before it, agreed that Mr. Spencer had been denied his right to present a defense. At that time, however, the court reversed Judge Cogan's grant of habeas relief because this court determined that the New York State Court of Appeals had not unreasonably concluded that the error in denying Mr. Spencer his right to present a defense was harmless error. Specifically, what this court said last time in 2019 was that it found that indeed the evidence of guilt was strong, and it also said very importantly for present purposes, quote, Spencer did not purport to offer any evidence beyond his own testimony to support his theory that he was framed by Officer Palmer. We now know, however, that there was abundant evidence in the form of six potential witnesses who have come forward who said that they were prepared to testify in his behalf, and that defense counsel was aware of their presence, but nonetheless, they weren't called. These witnesses fall into two general categories. The first category is witnesses who attested to the relationship between Officer Palmer and Kendall. And a couple of those witnesses said not only did they know each other, but that they had a corrupt type relationship. And secondly, the witnesses who attested that they came on the scene and actually saw somebody pointing a gun at Spencer, at Mr. Spencer. So there's no question that had these witnesses testified, that indeed it may have made a difference in this case had the jury believed them. So what- What's the evidence that the counsel was aware of the witnesses? You said that counsel was aware. When I look at the affidavits, there are some that talk about they've been told by the appellate's mother that the appellate had communicated their accounts- That's right. To the lawyer, but as regard to others, there doesn't seem to be any evidence in the affidavit. Well, actually, you have to take a look also at Mr. Spencer's own affidavit, which fills in those gaps. So with regard to each of these witnesses, their identity had been made known to defense counsel, and yet they were never called. What would the trial have looked like had, in fact, these witnesses testified? And I respectfully refer the court to pages 45 to 47 of our initial brief. But Mr. Spencer in each of these witnesses has a powerful motive to fabricate. Which of these witnesses? Each of them, including Mr. Spencer. I'm not sure what that motive would be, Your Honor. What motive is the court- It's to secure a different outcome for Spencer. But why- The motive is no different than, theoretically, the motive of a government witness who wants to secure a conviction. But the fact that there are witnesses who know- This information surfaced long after the proceedings. When did this information surface? When did it surface? It surfaced in, I believe, 2017 when the 440 was filed. But the 440 wasn't filed until after all the direct appeals had been concluded. And that was not even an issue. And to the extent it is an issue, it's the kind of issue that should be addressed at a hearing, not just summarily used in order to exclude them from possibly being witnesses. In this case, Judge Kogan said, well, maybe there were strategic reasons for not calling them. And the strategic reasons were the suggestion that they knew the defendant's mother, or in one particular instance, Mr. Christie's instance, that he had a previous conviction. Yet, first of all, those supposed strategic reasons were based entirely on hearsay. And this court has previously ruled that hearsay is not admissible in a habeas corpus proceeding, that it cannot be used to explain counsel's failure to do something. And in fact, this court explicitly held that, when it previously held in Griner v. Wells, that the affidavit from the habeas counsel, which discussed a conversation with defense counsel concerning why certain things weren't done, was properly excluded because it was hearsay. And this court noted that under the rules, habeas proceedings are guided by the federal rules of evidence as well. And if it can't be used in order to assist a client in making the argument that counsel didn't do something, it certainly shouldn't be used to hurt a client. It was hearsay. It was inadmissible. There was no other evidence concerning the reasons that defense counsel supposedly ignored these witnesses. Furthermore, your Honor's note- In the absence of evidence, and I hear your argument that we're looking at these affidavits without the benefit of a hearing behind them, but what is the evidence that the attorney was ineffective then? Sure. Just the existence of the witnesses? Well, there's no question that the basis for this portion of the habeas claim was that defense counsel was ineffective in not, number one, at least speaking to these witnesses. And then, if it seemed appropriate to call them, as we believe it was, calling them. The Supreme Court in Strickland had said that strategic choices made after less than complete investigation are reasonable, precisely to the extent that reasonable professional judgment supports the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In this case, defense counsel, who Mr. Spencer swore was aware of these facts, simply didn't investigate. And when defense counsel testified, she affirmed firstly that she didn't remember very much about the case at all. Her file, which she said was as complete as it ever was, had no notes on it, no cross-examination on it, no investigation. There's no evidence that an investigator was ever hired to search out any witness, let alone the witnesses that were brought to her attention. She simply didn't do her job. And to the extent that the people want to argue, well, these witnesses are all liars, or they came forward late, or whatever it happens to be, and they can make those arguments. They're entitled to make those arguments, but those arguments are determined by the facts. And the facts are determined at a hearing. And in this case, Judge Kogan denied the motion based on his view of what defense counsel should have done or may have done or didn't do. Positing these strategic alternatives based upon hearsay affidavits, which aren't admissible for that purpose, and based on reasons, namely that they knew each other, and that one of them, Mr. Christie, had a criminal record which is not ipso facto exclusionary. This court knows from all the criminal cases this court handles that the government often makes its case with witnesses who know each other. The government often makes its case with witnesses who have criminal conviction. Happens all the time. But the way a prosecutor determines and the way a defense counsel has to determine whether or not to use these witnesses is to interview them and to determine how strong their case is otherwise. In this instance, as this court noted, the problem that Andrew Spencer had was that he had no witnesses. He had no witnesses. That was the problem. And yet, that's the void that all of these witnesses would have filled. A district- The government's case was essentially built on eyewitness testimony. None of these witnesses, none of these new witnesses were witnesses to the incident that led to his conviction. That's not so, your honor. For example, Mr. Christie said that he arrived on the scene, and he saw this other person who didn't testify, holding a gun to Mr. Spencer's head, the person named Kendall. He said he was there. He said he saw him holding a gun to the head. So did another witness say the same thing. So these were people who were on the scene. But really, although the others were not on the scene, they had something very important to say. Because what this police officer Palmer said was, number one, I don't know Kendall. Even though, by the way, his own wife said she knew Kendall. His own brother-in-law, who lives in the same building, said, yeah, I know Kendall. But Palmer said, I don't know Kendall. I don't know anything about him. These other witnesses would have said, of course he knows Kendall. I've seen him in the presence of Kendall when Kendall was dealing drugs in front of his house. And if the jury believed that testimony, or if they thought it raised a reasonable doubt, then they would have acquitted, because they would have found that Officer Palmer was untruthful. But to answer the court's question, yes, there were two witnesses who saw part of these events, and saw a person holding the gun to Mr. Spencer. And with regard to Mr. Christie, he affirmatively said that person was Kendall. The prosecutor in this case, if I can just finish up, I realize I'm over time. The prosecutor in this case, and prosecutors of course know their cases better than anybody, understood what her main strength was. And her main strength was that there was no evidence to support what Mr. Spencer was saying. So what she said to the jury was, now the defendant did give an opening statement. He opened with a wild and wacky story about drugs and drag racing, all kinds of stuff, and some fantastic close friendship, and he didn't support it with a single shred of evidence. Now she knew he couldn't support it, because the court wouldn't let him support it. She said, remember this claim that there is a frame up? So what does the defendant rely on? And then she said, Spencer was the only person who was an interested witness as a matter of law. And then she said, he has a motive to lie that no one else in this case has. And then she says, why on God's green earth would they frame him? Well, she knew the answer to those questions based upon the proffers, but the defense wasn't permitted to elicit that testimony on cross or through Mr. Spencer's own testimony. And now we have six witnesses who would have corroborated it. And Judge Colgan, without a hearing, relies on hearsay to conclude, well, because they had a record, or well, because they knew the mother. Maybe that was a strategic reason why this lawyer didn't call them. That's not enough, Your Honors. Thank you. Good morning, Your Honor. Assistant District Attorney Sharon Brought from the office of Melinda Katz for the state. If I may, defendant had a heavy burden in this case, even under a de novo review standard, to show ineffective assistance of counsel. And he failed on three fronts. First, he failed to show that this attorney was aware of these witnesses who the record really supports didn't exist at the time. Second, he failed to show the absence of a strategic reason, assuming they existed, for not calling them. Since, contrary to the representations of the petitioner in this case, there was only one witness who was relevant here. The two fact witnesses did not tell the same story as defendant himself. And two out of the three witnesses who were witnesses to the alleged relationship talked about a relationship between Kendu and what was going wrong. So they impeached Kendu. Only one, Antoinette Gordon, and she's very interesting, says that she saw Kendu and Officer Palmer together doing whatever they were alleged to be doing. And the third reason is he can't show prejudice, despite the fact that this court said if he had had more support, that might have had a different outcome. Because this is not the support. This is not neutral or even factual support of his case. First, there's very strong evidence that when this attorney at the hearing said she didn't remember, she was trying to avoid calling her client a liar. The fact is, she did a bang up job defending this case. She came in with a theory that she fought tooth and nail to get in front of the court. And even when the court barred her from doing it, she kept trying to introduce that testimony. The court kept shutting her down. Part of her complaint was the sua sponte sustaining of objections that the prosecutor didn't even make. Well, they were all related to the violation of the order of the court, however wrong that order was. So she fought to get this evidence in. She didn't know going in that the court wasn't going to permit it, but yet none of these witnesses were on a witness list. You put a witness list in to make sure that the jury doesn't know any of the witnesses. When you pick the jury, you say, does anybody know any of these names? So there's ample evidence that she didn't really hear about these witnesses. And Antoinette Gordon is one of the best pieces of proof because she didn't remember almost nothing about the case. She remembered a lot about the case. And she said that she remembered Antoinette Gordon because she approached her after the trial or towards the end of the trial in the area outside the courtroom to say what a circus it was, how badly the judge was treating her. So she remembered her, but at the hearing, she never said, this was the second time I met her. because Antoinette Gordon says, I gave the information to Smiley's lawyer, meaning the petitioner's lawyer. She never remembered meeting her before. She certainly never remembered hearing the name. There was ample evidence that this entire 440, which, by the way, the court asked. It was filed in 2014, at least according to the dates here. There was ample evidence that this attorney was really trying not to call her client a liar, a client she still held affection for, a client she still hoped would prevail. I'm a little, the fact that she's stating she doesn't recall this, I mean, I'm a little, I don't know what the word is, but the suggestion that, I guess I'm skeptical that there's ample evidence here, oh, she's just lying for her client. I mean, she's submitting an affidavit saying that she doesn't remember the particulars from this case from 13 years ago, for which she doesn't have very good records, which doesn't mean that she does or does not remember it. Correct, Your Honor. She not only submits a sworn affidavit, she submits sworn testimony to that effect. But my point is that she remembered very well about this case a lot, including the fact that the judge kept shutting down her defense. The idea that she wouldn't remember any witnesses that were offered to her, that she wouldn't have interviewed them, but that she wouldn't remember, forget the names, but that she wouldn't remember that there was a host of witnesses who could have supported this alleged relationship and this alleged motive to lie in life. Did Mr. Spencer attest about what she knew? Yes, after the state pointed out that he had failed to do that in his initial papers and that none of his witnesses had done so, he submitted an additional affidavit that said, by the way, yes, I did inform her of this. Now, the fact that he submitted it later doesn't per se mean he was lying. But again, if one looks at the entire record of the trial, coupled with the record of what happened in the 440 litigation and in the hearing in the federal court, if one looks at the entire record, he hasn't sustained that burden. If I may also move on, the strategic reasons are not just that these people were interested witnesses, friends of the mother of the defendant, and otherwise not perfect witnesses. It was the fact that their testimony, again with the exception of Antoinette Gordon, was not directly relevant to the issue that she was presenting. As to the two fact- Could we fully know that, though, without having heard from these witnesses in a hearing of some kind? Absolutely, Your Honor, because he's bound by his affidavits. He proffers, in order to get the hearing, whether in state or federal court, he proffers affidavits saying, describing the testimony, if I may address the fact witnesses, describing the testimony that they would offer. And that testimony does not, either didn't comport with his own testimony, in that the person who recognized Kendu said that Kendu held a gun to his head, which was what the defendant said never happened. And the other one said, I saw a person, and he doesn't name him, holding a gun to petitioner's head. And that was, in fact, Officer Palmer's testimony, that he held the gun to his head. Right, but isn't it the case, though, I mean, even if these witnesses' testimonies would not be identical or dispassionate, the jury had heard it, isn't it? Again, we are limited, in the case of getting the hearing, to the affidavits as proffered by defendant. And no, the answer is, what's in those affidavits could not disturb the jury's rejection of defendant's description of the events, which to begin with was not very logical or it required a conspiracy at amazing levels. And it required the ignoring of the 911 calls, which were contemporaneous and which certain things could be heard in the background. And of the neutral witness who saw petitioner punch Officer Palmer, whom she knew, in the face, which is exactly how Officer Palmer described the beginning of the incident. That's as to the strategic reason, as to the fact witnesses. Again, as to the- What was said on the 911 calls, do you know, standing here? As I recall, the 911 calls from the wife and the other, I think, officer, I think Blackman's wife, if I'm not mistaken, were made. And they were just describing what was happening, and that the petitioner had punched Officer Palmer. That one of them even described him offering the bribe. As far as- I'm sorry, can I just jump in just a little bit? There was a 911 call from Palmer's wife. Right. And the other call was from whom? I'm going to check that. I believe it's from Peter Blackman himself, the brother-in-law. So Palmer's wife and his brother-in-law. Right, right. And wasn't there a 911 call made by, I mean, the independent witness called her father- And her father- And he asked her father to call 911. And asked her father to call 911. Did that in fact happen? Yes, he called 911. And I believe the 911 call there was introduced, but I'm not sure what kind of helpful information. It was her testimony itself that was offered at trial as to what she had seen and that she ducked down when she saw the gun pulled by the petitioner. And then as to the witnesses, as to the motive to lie and bias, very quickly, again, only one of them talked about Officer Palmer and Kendu. The others talked about Kendu being a drag racer and a drug dealer. And again, the likelihood of any of this being true in light of the way it was proffered and the fact that this attorney had one theory of the case that she fought tooth and nail to put before the jury is very low. Finally, because of the weakness of these witnesses and the strength of the neutral witness, notwithstanding that this court's original decision talked about if there had been additional evidence, this is not enough evidence to overcome the prejudice that, to establish the prejudice that he needs to establish in order to- Let me be sure I'm clear about your view of this defense that was mounted at trial. You said she fought tooth and nail to establish the defense. What was she doing? What was the defense? The defense was a motive to lie on the part of, and a bias on the part of Officer Palmer, in that he had a relationship with Kendu, it was a corrupt relationship as petitioner describes it. And that therefore, Officer Palmer was covering for Kendu who had the gun, was stepping in to assist him, and was behaving in all sorts of improper ways. And that the events happened as petitioner described them. So that was her defense. And her defense, what the court didn't allow her to do was muddy up the officer by talking about this alleged drag racing and drug dealing and whatever else he was going to say. So that was her defense. If the court has no further questions, the state relies on its brief. My colleague says that what she wasn't allowed to do was muddy up the officer. That's precisely what three courts have said violated his constitutional rights, muddying up the officer. One of the problems that we have, very frankly, as criminal defense lawyers, is that no matter how many inconsistencies there are in the people's evidence, it doesn't seem to mean anything. But if inconsistencies at all are found between witnesses for the defense, supposedly that demonstrates as a matter of law that in a case like this, no hearing is necessary. No factual findings have to be made based upon an actual hearing. In our reply brief at pages 14 to 16, you'll see all the many inconsistencies in the people's proof in this case. And there were numerous ones. There were very important inconsistencies between the witnesses themselves. There were very important omissions, this bribe money, which supposedly was this huge wad of money that was supposedly coming out of Mr. Spence's pockets, not a dime of it was ever found. Not a dime of it was found. There was no effort to take fingerprints off of the gun. This so-called neutral witness who testified, who the people keep mentioning who saw these events, Janice Tanksley. Her entire testimony, her entire direct, is less than three pages. Nobody else on the scene even sees her, even sees her. And everybody says, well, she's a neutral witness. Well, she's a neighbor and apparently a friend of the officer's brother-in-law who lived there. And obviously knew who the officer was. So she's not neutral in that sense. But of course, witnesses who know each other for the prosecution, well, that's okay. But witnesses who know each other for the defense, they're excluded because nobody can believe them. At the very least, wasn't he entitled to a hearing? Wasn't he entitled to have his day in court? He didn't get that, your honors. And I ask the court, therefore, to, at the very least, remand this case for an evidentiary hearing. Thank you. Thank you both, and we'll take the matter under advisement. Nicely done. That's the last case to be argued this morning. So I'll ask the clerk to adjourn the court. The court is now adjourned.